THE PARISH OF BELLPORT, and EDMUND PETTY and others, trustees of said parish, *vs.* SAMUEL TOOKER and others.

Upon the authority of *Robertson* v. *Bullions*, (1 *Kern.* 243,) the right of a majority of the corporators of a religious society to change their form of church government, and pass from a congregational church to an organization in connection with the presbyterian body, is unquestionable.

Where, in an action to recover the possession of a lot of land and a church edifice erected thereon, four of the persons named as plaintiffs, in connection with the religious corporation, and claiming to be trustees of such corporation, deduced their title to their office as trustees, from a meeting held by that portion of the corporators who adhered to the congregational organization, at which four trustees were elected—two to fill vacancies occasioned by the expiration of official terms, and two to supply the places of those who united with that part of the corporation in connection with the presbyterian organization—and from the time of their election to the commencement of the suit they had not had possession or control of the church edifice or corporate property, and except for a very brief season had been excluded there-

from, and from the exercise of all functions, as officers of the corporation; and on the other hand the defendants deduced their title as trustees, by regular succession and election, from the time of the incorporation of the society down to the time of the commencement of the action; and during all this time they and their predecessors had been in the actual possession of the church edifice and property, holding it for the corporation and its members, and exercising without interruption the usual functions of corporation officers; *Held* that the defendants were the rightful trustees of the corporation.

And it being manifest, from the pleadings, that the title to the lands and church edifice was not put in issue, nor the right to the possession, but only the title to the office of trustees of the religious corporation; *Held* further, that as soon as it appeared, upon the trial, that the defendants were in possession of the premises in dispute, holding them from the religious corporation under color of an election apparently regular, held in conformity with the statute, the plaintiff should have been nonsuited.

In an action of ejectment, brought in the name of a religious corporation and by persons claiming to be trustees of the corporation, to recover the church edifice and land, on the ground that the corporation is the owner in fee, and entitled to the possession, from which it has been wrongfully excluded by the defendants, the right to the office of trustees, as between the plaintiffs and defendants, cannot properly be entertained and determined.

No two issues can possibly be more incongruous than one upon the title of a corporation to a piece of land, and the title of a class of persons to administer its affairs as its directors and officers. *Per* BROWN, J.

The remedy for an intrusion into, and usurpation of, a public or corporate office, was an information in the nature of a *quo warranto*, filed by, and in the name of, the attorney general, upon his own relation, or upon the relation of a private party. The remedy is still substantially the same, under the code, except that it is an action in the place of an information, and is still brought by the attorney general. *Per* BROWN, J.

APPEAL from a judgment rendered at a special term. The action was brought to recover a lot of land and the meeting house thereon, situate at Bellport, in Suffolk county. The cause was tried at the Suffolk circuit, on the 4th of June, 1858, before EMOTT, justice, without a jury, by consent of parties. Judge Emott decided the cause in favor of the defendants, and gave the following opinion:

EMOTT, J. "This is an action of ejectment, brought by the individuals named as plaintiffs, together with the corporations which they claim to represent, against the defendants, for a lot of land and meeting house or church thereon. It is ad-

mitted that the title to these premises is in the trustees of the corporation known as the Parish of Bellport, and the defendants do not make any claim adversely or in hostility to this title. They deny that they have ousted the corporation, or that they hold the land and building in question against it, but alleging that they are the actual trustees and officers of the society, deny that the plaintiffs are its trustees, or have ever been properly and legally chosen to the offices which they claim. The defendants also admitted, at the trial, that they were in possession of the premises, justifying their possession, as I have said, as trustees of this religious society. The issue raised by the pleadings, therefore, is the title of the defendants to be trustees of the corporation. It admits of a serious question, whether the respective rights of these two sets of persons claiming to be trustees can be determined in such an action as this, or whether the validity of either election can be examined in this collateral way. The proper method to bring such a question before the court is by *quo warranto*, and in any other proceeding, or at least in a suit like the present, the possession of either body of trustees, both of whom were elected under color of right, ought not to be disturbed. Such would seem to have been the rule of the older cases, founded upon very good reason. (*See opinion of Van Ness, J., in Jackson v. Nestles, 3 John.* 133.) This objection, however, has not been taken by the defendants, and possibly the fact that the corporation is nominally a party to this suit, together with the laxity and uncertainty as to all pleading and procedure, and the nature of actions, under our present system, may prevent the application of the rule. At all events, as both parties have elaborately presented their respective titles to the office of trustees, and invoke the judgment of the court, and as I have a clear opinion upon that point, I shall proceed to examine the question whether the plaintiffs or the defendants are trustees of the parish. I hope that I may thereby, at least, contribute something towards terminating, or removing from the courts, this un-

The Parish of Bellport *v.* Tooker.

happy controversy. From the evidence, it appears that in July, 1836, a congregational church was organized in the village of Bellport, its ecclesiastical officers chosen, and a minister invited to preach. There was then no church building or property, and no corporation to take or hold title to any. On the 8th day of March, 1843, the persons who were connected with this independent church organization and attendants upon its services, met, after notice given according to law, in the academy, where their services were held, and became incorporated as a religious society, under the act of 1813, by the name of the Parish of Bellport. Six trustees were elected, and the proper certificate made and filed. The property now in dispute was subsequently conveyed to the trustees of this corporation, and there was no dispute as to the persons holding this office, until the year 1852. Before this time, however, disputes had occurred in the society in respect to the employment of a preacher, and perhaps on other subjects, and a presbyterian party had grown up among them. In November, 1851, the trustees then in office called a meeting of the parish or society, to determine the denomination of the church. Before this meeting took place, a suit was commenced by three persons, members of the congregation and society, against four trustees then in office, and the corporation itself, alleging that the defendants had excluded them and their associates and the church and society from the use of the church building. After the complaint in this action was filed, the meeting called by the trustees took place, on the 28th of November. A majority of the persons then present voted in favor of connecting the church with the presbyterian body. There is some difference between the parties to the present suit, and some conflict in the evidence, as to whether those who participated in this meeting were all of them members of the society and entitled to vote. But there is no sufficient proof that this meeting was not legally called and legally conducted, as a parish meeting of the congregation or corporation. The effect of

this action will be considered hereafter.   After this meeting, and in January, 1852, a Presbyterian church was organized by the presbytery of Long Island, upon the formal request of certain of the attendants upon the services and members of the corporation of the Parish of Bellport.   These persons took regular letters of dismission from the congregational church to the newly formed church or ecclesiastical body of presbyterians.   A supplemental complaint was then filed in the suit of which I have been speaking, stating these additional facts and asking for a judgment, declaring that the then plaintiffs and their associates were the true church and corporation and entitled to the meeting house, and that the defendants were seceders and intruders.   This was a contest for the property, between the adherents of the congregational church or religious organization, and the adherents of the presbyterian church, among those who had belonged, or did belong, to the parish. It was an attempt to remove into the courts, for settlement, the dispute which had been going on among themselves.   The gravamen of the complaint in that case, that is, the principal act of the defendants which was complained of, was the exclusion from the meeting house of a clergyman employed by the congregational church or society, and the same person who preached in the church, and had been paid by the trustees regularly until September, 1851.   This case was decided by the supreme court in favor of the defendants, on the ground that no breach of trust towards the corporation was shown sufficient to lay the ground of a suit against the trustees. This ground was taken both at the circuit and the general term, although it was reached and laid down somewhat differently at the trial and on the appeal.

On an appeal to the court of appeals the judgment was affirmed, and two opinions were delivered.   One of these argues that the clergyman, whose exclusion was complained of, was not properly called, because he was invited or employed by the church or ecclesiastical body only, and not by the church and congregation.   The other opinion puts the dispo-

sition of the case on the doctrine enunciated in *Robertson* v. *Bullions*, (1 *Kern.* 243.) That doctrine, as applied by the learned judge to the case in hand, was, that the church or body of professing christians is entirely distinct from the ecclesiastical society formed under the act; that although the same persons belong to both, yet the law takes cognizance of their rights only as corporators and not as church members; and that no injury to the plaintiffs as corporators was shown, but only a failure to discriminate properly as to the ecclesiastical position of different corporators. It may be difficult to ascertain which of these opinions expresses the views of the court; but in the present case it is not very material to do so. The decision of that controversy does not dispose of this, whichever opinion is regarded as authoritative. The question here is purely as to the legal rights of the parties, a question which was not presented to, nor decided by, the court in the former suit. The plaintiffs in that action were defeated because they did not show any violation of any legal right in themselves, as corporators of the parish of Bellport, considered as a corporation. In the present case, on the other hand, is presented simply the question of the legal right of the plaintiffs or defendants to the office of trustees. In the opinion delivered by Judge Shankland, he uses this language: "In my judgment, it is clear that the meeting house and lot is the property of the congregational church and society, and not of the new church which was organized in 1851. At the time the deed was executed and the house built, no other church existed at Bellport but the independent church and society of Bellport. By no legal possibility, therefore, could a subsequently created church and society take any benefit under the deed." Again he says: "the vote of the congregation to call the meeting house a presbyterian house is of no avail. It gives no rights to the new presbyterian church in the said house, nor did it deprive the congregational church of any they previously possessed." If these staments are to be taken, literally,

as the judgment of the court, looking at them apart from their connection, and without considering the other opinion in the case, they might seem to dispose of the whole matter in controversy between these parties. But I apprehend this would not be doing justice to the cause or the court. It is plain that such a proposition as is contained in the paragraphs which I have quoted, is not involved in the judgment of the court. That judgment was that the plaintiffs, who represented the congregational organization and party, were not entitled to the relief they asked against their opponents, the presbyterian party. This judgment rested on one of two reasons, as indicated in the two opinions given, either that Mr. Tomlinson, the minister who was excluded, was not regularly called or appointed to preach there, and therefore the defendants had a right to exclude him from the pulpit, which is Judge Shankland's view, or that his exclusion as a congregationalist, and the recognition of a presbyterian minister and his friends forming another portion of the corporation, was not an infringement of the legal rights of the corporators, but merely a failure to discriminate rightly as to the ecclesiastical position of different portions of the corporation. Either or both of these propositions may be considered to have been decided in the court of appeals, but clearly not the exclusive legal or equitable right to this property of either the presbyterian church and those adhering to it, or the congregational church and those composing it. But, with great respect for the learned judge, I think the reasoning of Judge Shankland rests upon an assumption, which is inconsistent not only with the views of Judge Johnson, in the opinion delivered by him, but with the doctrine of the case of *Robertson* v. *Bullions*, which is certainly a controlling authority upon questions of this nature. The assumption to which I refer, is the identity of the Parish of Bellport with the congregational church or society, which was organized there in 1836. If these two bodies are identically the same in law, not merely because the same persons composed each at their

respective organizations, but because the Parish of Bellport was the congregational society of Bellport, without any legal distinction possible between them, that would go far to put an end to this controversy. But that is far from being the fact or the law, and the two bodies cannot be confounded without leading us into grave errors, especially in a controversy involving legal rights, and not the enforcement of any trust or equitable duty. The case of *Robertson* v. *Bullions,* as is said by Judge Johnson in *Reeve* v. *Post,* establishes that all the members of the society which is incorporated become a corporation, and not merely the trustees, as representing a church or ecclesiastical body; that this corporation is a lay corporation, and is entirely distinct from any purely spiritual, if it may be so styled, or ecclesiastical body. Even if the very same persons had from the outset composed the church and the corporation, yet the two bodies would continue distinct, and the rights of every individual member of both would be different, as referred to in his connection with one or the other. Judge Allen, in his opinion in *Robertson* v. *Bullions,* says: "The church proper, as a collective body of christians, who have made a public profession of the christian religion, and are united in fellowship and communion under the same pastor and form of church government, is entirely distinct from the ecclesiastical society framed under the act." The judgment in that case expressly decides, that where property was held by trustees for the benefit of an incorporated society, on special trusts for the exclusive benefit of those who adhered to a particular faith, if these very persons became incorporated and the property was conveyed unconditionally to the trustees of the corporation, these exclusive rights were surrendered, and the property became the property of the corporation, to be managed and controlled for the benefit of all who are recognized by the statute as its members. The rights of the members of a church, and the test of admission to those rights, can be settled by their own agreement; the rights of the corporation, and the test of

membership of the corporation when it is formed, are prescribed by the statute.

It will be observed that the religious society, in the present case, was incorporated without any mention or assumption of any denominated name or preference. It is the parish of Bellport. Its members consist of the stated attendants upon the worship regularly conducted in such church, who have contributed to its support. Every such person, whether he be a member of the church organization or not, and whatever may be his denominational preferences or connections, is entitled to the rights of a corporator in this society. Judge Selden shows, by a convincing argument, in his opinion in *Robertson* v. *Bullions*, that neither the trustees of such a corporation, nor the corporation itself, can take or hold real estate upon a trust for the exclusive benefit of a portion of the corporators, of those only who continue to hold a particular creed, or adhere to a particular form of church government. When lands are conveyed as these were, to a religious society, incorporated under the statute, or to its trustees, unconditionally and simply, they must be held for the benefit, and subject to the control of, the majority of the corporators. They may not only select their officers, and thus control the property, but they may change their faith and their form of worship, or their discipline, at pleasure, and it is not in the power of the courts to interfere. In the strong language of Judge Selden, in the case just referred to : " It was the intention of the legislature, to place the control of the temporal affairs of these societies in the hands of a majority of the corporators, independent of priest or bishop, presbytery or synod, or other ecclesiastical judicatory." The courts are thus relieved in such cases of the interminable disputes growing out of religious differences among the members of such bodies, and the power over the church property is placed where it ought to be, in the hands of a majority of its owners. In the present case, the question whether the corporators who organized this parish, were all of them, or a majority of them, congregationalists, and whether

the formation of a presbyterian church, or the adoption by a vote of the society, of the presbyterian name, or ecclesiastical connection, was a departure from the object of the founders of the parish, is irrelevant to the true issue. It can only have a bearing in one aspect of the case, that is, upon the question whether the persons who introduced this change, and still endeavor to adhere to the connection with the presbytery, have thereby ceased to be attendants upon the public worship of the parish, or society of which they were corporators. Such attendance, as well as a participation in the support of the minister, is required by the statute, as we have seen, as a qualification for voting and taking part in the concerns of the corporation. It becomes necessary to determine what worship, and by whom conducted, such persons are required to attend and support, in order to be and continue corporators. I think it is perfectly plain, that it is not worship or ordinances, celebrated in accordance with any particular profession of christianity. It is not the worship conducted by the minister of that denomination, or preaching those doctrines which were accepted by the founders, or original corporators of the society, or which are in accordance with its design or profession, or even its name. Such a view of the statute would be in obvious conflict with the eighth proposition adopted by the court of appeals, in *Robertson* v. *Bullions*, and which I have just cited, as well as with the whole doctrine of that and former cases. It is the worship conducted with the sanction of the officers of the society, and under the direction of a majority of its members, which is the public worship of the society. Such public worship is no less the public worship of the society, although it may proclaim different doctrines, or follow a different mode of worship from that of the founders of the church, provided it be statedly and regularly conducted according to the will of the society, which means the will of a majority of its members, regularly and duly ascertained and expressed. We are now prepared to consider the remaining facts of the case. It is upon the effect of a very few of these which occur-

red immediately after the parish meeting in 1851, and the institution of a presbyterian church in January, 1852, that the whole controversy in the present case hinges. After the organization of this presbyterian church, the minister who was installed by the presbytery, continued to preach statedly in the meeting house. The minister who had been employed by the congregational church, or by the society, or parish, previously, and down to the fall of the year 1851, also continued to preach, and hold separate services at a different hour. These two sets of services continued until about November, 1852, when a decision having been made in the supreme court, in the former suit, adverse to the plaintiffs in that suit, the trustees who had been chosen at the election, which the present defendants say was the regular election for that year, assumed entire control of the building, and excluded the congregational minister altogether from its use. In February, 1852, however, it will be seen, at the time for the annual election of trustees, there were two different clergymen conducting worship, at different hours of the day, on Sunday, in this church.

On the 21st day of February, an election was held pursuant to a notice which had been given in the manner prescribed by law, by the minister adhering to the presbyterian church, at public worship conducted by him. There is no objection made to this election, except that it was ordered by the trustees who adhered to the presbyterian church, notified at the worship conducted by their minister, and participated in by those who professedly were presbyterians, and attended the service of the presbyterian minister. Now I think the decision of the former case in the court of appeals, establishes at least that the Rev. Mr. Tomlinson, who preached to the congregationalists, was not the regularly called minister of the society, and was not entitled to exclusive recognition of himself, and his services as such. This proposition is distinctly negatived by both the judges who delivered opinions: by Judge Shankland, on the ground that he was not at that time properly settled or employed; and by Judge Johnson, because he holds

that excluding him or interfering with his services, and substituting another minister, under the circumstances of the case, was not a violation of any rights of the corporators. I think the plaintiffs cannot contend since that decision, that the clergyman employed or sanctioned by the trustees, or a majority of them, was a mere intruder, with no color of right. The election itself was held as the statute directs, by the existing trustees; it is not alleged to have been unfairly conducted, no portion of the corporators was disfranchised or refused a vote, and no complaint is made of it, except that it was appointed and completed by those members of the corporation who had participated in the proceedings, which had resulted in the introduction of presbyterian preaching and worship; not, however, because the others were excluded, but because they refused to take a part. It is earnestly contended by the learned and experienced counsel for the plaintiffs that the proceedings of the parish meeting in November, and the consequent formation of the presbyterian church, were a secession from the society or parish, that is, from the corporation. After a careful consideration of his argument, I am convinced that he is under a mistake in this particular, and that the source of that mistake will be found in treating the congregational church, and the religious corporation, as identical. This error may have grown out of the doctrine originally put forth in the other suit, and which was held by many in the courts and the profession, until the decision of *Robertson* v. *Bullions,* that the trustees of such societies were the corporation, and that they held church property in trust for particular ecclesiastical organizations, or for the adherents of particular creeds or doctrines. We have seen that this construction is completely discarded, and that the question of membership of a religious society, must be settled according to the statute, and the rights of every member are equal. I do not discover any thing urged against the parish meeting of November 28th, 1851, except the action which was taken at it. It must have been properly called, and those who voted at it were, with possibly a few

exceptions, legal voters in the parish. There was no attempt made to reconsider its action, or reverse its proceedings, and although the persons who are recorded as voting at this meeting, may not be an absolute majority, yet we can have no evidence that they were not. Those who did not see fit to attend must be bound by the action of those who did. The courts can receive no other evidence of the will and action of a majority of the society, than is afforded by a formal vote, regularly passed by a majority of those who attend its meetings. It is said that the action of this meeting could not affect the legal rights of the opponents of the change proposed, or of the congregational church. The congregational church, as such, had no legal rights. As to its members, and those who desired to continue in congregational fellowship, and to continue congregational worship in the church, it is unquestionably true that the action of this parish meeting could not affect their legal rights. It did not make them any the less members of the incorporated society, and entitled to a voice in its affairs. Nor did it, in my judgment, make those who participated in it, seceders or outcasts from the society. It would be difficult to show that any such vote of a majority of the members of such a corporation, at a properly called meeting of the body, could have that effect. I think this proceeding must be regarded as a resolution by a majority of this religious society at that time to abandon the congregation discipline, and adopt the faith and discipline of the presbyterians, and as a sanction and authority for the subsequent action of the trustees, in opening the church to presbyterian worship and preaching. Such a change it was clearly in the power of the majority of the society to make, just as it would be for the present plaintiffs and their friends, if they are in a majority, or can obtain a greater number of votes in the parish, to revert to congregationalism. These are questions of the will of a majority of those who belong to the corporation, to be determined at their meetings, and not questions of trusts for the courts. It follows that the trustees, in February, 1852, were at least justi-

The Parish of Bellport *v.* Tooker.

fied in regarding the presbyterian worship and minister as the stated worship, and preacher of the society, and that the plaintiffs' objection to the election of trustees on the 21st of February, 1852, to which the defendants trace their title, is insufficient. But there are additional considerations of no slight weight, in deciding the controversy between these two sets of trustees. On the 24th of February, 1852, the other election of trustees was held, pursuant to an appointment by the two trustees who adhered to the congregational connection, and under a notice given at the public worship which this party kept up. At this election two person were voted for as trustees, to fill the places of those whose terms expired, and two others, to be trustees in the room of two who had yet some time to serve, but who having connected themselves with the presbyterian church, or favoring the presbyterian movement, were regarded by the congregational church as seceders from the society, and as having forfeited their offices *by refusing to act.*

This assumption was entirely unwarranted. The terms "refuse to act," used in section 6, probably refer to an original and continued refusal on the part of a person chosen trustee to accept the office. But even if they do not, the judgment in the former case of *Reed* v. *Post*, and the principle of the well reasoned case of *Robertson* v. *Bullions*, so often referred to, are conclusive that these trustees had been guilty of no acts which could forfeit either their corporate rights or their official position. This election was therefore entirely irregular in this particular. The parties conducting it took another step, which was the result of the error into which they have constantly fallen, and which, as I have endeavored to point out, is the fundamental fallacy of the present suit, that of confounding the congregational church and the incorporated parish. They excluded from voting all the pew-holders and attendants at the church who upheld

the presbyterian party and worship.   This cannot be justi-fied upon any principle consistent with the settled doctrines of the courts, and the sound interpretation of the statute. It is not necessary now to say that the adherents of either of these ecclesiastical bodies, or attendants upon either wor-ship, had exclusively the right to vote and act in the cor-poration and manage its concerns.   It is sufficient to inval-idate this election, that a withdrawal from the communion of the congregational church was not a withdrawal from this incorporated society, as long as the persons thus leaving their ecclesiastical connections continued to attend and sup-port a public worship in the church which had the sanction and authority of its officers, and, as far as we can see, of a majority of its members.   These persons might have made themselves amenable to ecclesiastical censures; they might have lost or abandoned their right of church membership, but they had not ceased to be members of the incorporated society, and could not rightfully be excluded from voting at its elections.   For these reasons, the election held on the the 24th of February, 1852, was irregular and invalid, and the subsequent elections down to that at which the present plaintiffs were chosen, held under the direction of persons claiming to be officers of the society, but who traced their title to this source, must fall with it.

Upon the whole, I have reached the clear conclusion that the election ordered by the trustees in office in February, 1852, or a majority of them, and which was held on the 21st of February, 1852, was legal and valid ; that the persons who voted at that election were corporators and entitled to such vote, and that the trustees then elected, with those then in office, were the legal trustees of this corporation, and that their successors, the defendants, are now its actual trustees, and entitled to the possession of its property.

I think it will ultimately turn out that the ground upon

The Parish of Bellport *v.* Tooker.

which the battle is to be fought between the contending factions in this little church, is the voting ground of the society itself, the election of its trustees, and the resolutions of its members; and that the party which can control the greater number of votes, must triumph at last. It is a source of satisfaction to the courts to be relieved of such controversies. Our tribunals are no place for the determination of questions of religious doctrine and discipline, and in our day and country there is no decision of disputes which turn upon such questions, with which the public ought to be satisfied, but the action of the parties concerned themselves.

I am happy to be able to dispose of the present controversy satisfactorily to myself, upon a pure question of legal right, without deciding upon the theological orthodoxy or consistency of any of the parties before me.

I am satisfied that the defendants are the legal trustees of this parish, and are therefore entitled to judgment."

From the judment entered at the special term, in accordance with the above opinion, the plaintiffs appealed.

*George Miller*, for the appellants.

*W. P. Buffett*, for the defendants.

*By the Court*, BROWN, J. The justice who tried this action at the special term pronounced with his decision an elaborate and carefully drawn opinion, which is decisive, I think, of all the questions involved in the controversy. It would be but a repetition of what he has already said, and a reiteration of arguments stated with clearness and precision, and which lead logically and necessarily to the conclusions at which he arrives, were I to enter at large upon

a re-examination of the questions.   The fallacy of the plaintiffs' case, if it be a fallacy, consists in the idea that pervades it throughout, that the religious corporation known as the Parish of Bellport, and the congregational church which they represent, are one and the same.   Assuming, and I think it may be regarded as indisputable, that the congregation at Bellport, and from which all parties claim descent, was originally a congregational church, it by no means follows that it was to remain such through all time ; and that the corporators or congregation had no power to change its doctrine and discipline and profession of faith, or to place themselves in connection with any other religious body without a forfeiture of their property and franchises, and leaving them all to the absolute enjoyment and disposition of the minority, however small, who chose to adhere to the old forms of faith and church government.   This view, doubtless, prevailed with the legal profession and the public, to some extent, until the learned and searching examination of the rights, duties and obligations of religious corportions formed under the act of 1813, by the court of appeals, reported in *Robertson* v. *Bullions*, (1 *Kern.* 243.)   And I am not able to read the proceedings and testimony in this action, and resist the apprehension that the plaintiffs and their counsel shared in this mistaken opinion.   The conclusions at which the learned judge (Selden) arrives in the case to which I refer, deserve to be remembered, because they cannot do less than remove from the tribunals of justice a fruitful and endless source of controversy and litigation upon the subject of church government, faith and religious belief, which the judges are not qualified by education and habits of thought to determine, and refers them for settlement to the individual conscience and judgment of those composing the corporate body.   They are these :  That a religious corporation, under the statute, consists not of the trustees alone, but of the members of the society.   That the

society itself is incorporated, and its members are the corporators. That the relation of the trustees to the society is not that of a private trustee to the *cestui que trust*, but they are its officers, with the powers of the officers of other corporations. That such societies do not belong to the class of ecclesiastical corporations, in the sense of the English law, but are to be regarded as civil corporations governed by the rules of the common law. That the trustees of a religious corporation cannot take a trust for the sole benefit of members of the church, as distinguished from other members of the congregation, nor for the benefit of any portion of the corporators to the exclusion of others. That the trustees of a religious corporation "cannot receive a trust limited to the support of a particular faith or a particular class of doctrines, for the reason that it is inconsistent with those provisions of the statute which give to a majority of the corporators, without regard to their religious tenets, the entire control over the revenues of the corporation." Upon the authority of this decision, the right of a majority of the corporators of the Parish of Bellport to change their form of church government and pass from a congregational church to an organization in connection with the presbyterian body, was unquestionable. And no other question remained for the determination of the judge, at the special term, but to ascertain who were the rightful trustees of the corporation of the Parish of Bellport—the persons named in connection with the corporation itself as plaintiffs in this action, or those named as defendants, if it was competent to determine that question in an action brought to recover possession of the corporate property. The weight of the evidence upon this point is with the defendants. Indeed there are some undisputed facts in the case, the force of which cannot be overcome by any considerations suggested upon the other side. The defendants deduce their title as trustees by regular succession and election, from the time of the incorporation of the society down to the time of the commencement of this action. During all this time they and their predecessors have been in the actual possession

of the church edifice and property, holding it for the corporation and its members, and exercising without interruption the usual functions of corporation officers. On the other side, four of the persons named as plaintiffs, in connection with the corporation, deduce their title to their office as trustees, from a meeting held on the 24th February, 1852, by that part of the corporators who adhered to the congregational organization, at which four trustees were elected—two to fill vacancies occasioned by the expiration of the official terms of two of the trustees, and two to supply the places of those who united with that part of the corporation in connection with the presbyterian organization. From the time of their election to the time of the commencement of this action they have not had possession or control of the church edifice or corporate property, and except for a very brief season may be said to have been excluded therefrom, and from the exercise of all functions as officers of the corporation of the Parish of Bellport. The judge, therefore, could do no less, under the evidence, if he entertained the question at all, than to determine that the defendants were the rightful officers of the corporation of the Parish of Bellport.

I think it right, however, to consider, very briefly, whether the right to the office of trustees could properly be entertained and determined in this action. In form and in substance it is an action of ejectment, brought to recover the church edifice and lands mentioned in the complaint, upon the ground that the corporation known as the Parish of Bellport is the owner in fee, and entitled to the possession from which it has been wrongfully excluded by the defendants. The prayer of the complaint is that the plaintiffs may be adjudged to be the owners of the premises claimed, in fee simple, and may recover the possession of the same against the defendants, with damages, &c. The title and right of possession is said to be in the corporation; and if the real purpose was to try the title and recover the possession, the action should have been brought in the corporate name alone, and the sole issue would have

been upon the title of the corporation, and whether the defendants had wrongfully withheld from it the possession. This would have been a simple issue, and the proof would have followed the allegations of the complaint. Now, however, we have as plaintiffs, in addition to the church corporation, the six congregational trustees, and they propose, in addition to trying the title to the lands, to try also the title to the office of corporate trustees, and that too in the absence of any allegation that the plaintiffs are wrongfully excluded therefrom, or that the defendants have wrongfully intruded themselves therein. The answer denies that the plaintiffs Edmund Petty, Alfred Petty, William C. Beal, Charles N. Homan, Nathaniel Reeve and William A. Homan are the trustees of the Parish of Bellport; denies that the defendants withhold the possession, but says and insists that they, the defendants, are the trustees of the Parish of Bellport, and as such hold the premises as the property of the corporation, and for the use and enjoyment of the corporators as a place of religious worship, without excluding the plaintiffs or any other person therefrom. It is manifest that the title to the lands and church edifice is not put in issue, nor the right to the possession, but the title only to the office of trustees of the religious corporation. No two issues can possibly be more incongruous than one upon the title of a corporation to a piece of land, and the title of a class of persons to administer its affairs as its directors and officers. The remedy for an intrusion into, and usurpation of, a public or corporate office was an information in the nature of a *quo warranto*, filed by and in the name of the attorney general, upon his own relation, or upon the relation of a private party. The pleadings put the right directly in issue and judgment was rendered upon the right of the defendant, and also upon the right of the person averred to be entitled. (3 *Black. Com.* 262. 2 *R. S.* 2d ed. 482.) The remedy is still substantially the same, under the code, except that it is an action in place of an information, and is still brought by the attorney general. (*Code,*

*title* 13, *ch.* 2.)   If the plaintiffs can prevail in this action, the
result will be equivalent to a judgment of ouster in the old
proceeding by information in the nature of *quo warranto.*
It will not be worth while hereafter to resort to the substi-
tute for that remedy provided by the code to try the title to
an office.   An action of ejectment for the corporate lands, or
an action to recover possession of its personal estate, will
bring up for trial and determination the regularity of the
election of its officers and directors and their title to adminis-
ter its functions.   *Jackson* v. *Nestles* (3 *John.* 115) was an
action of ejectment to recover the possession of certain lands
upon a tract called the Glebe, in the town of Newburgh.   The
title was vested in the trustees of the Parish of Newburgh,
and the lessors of the plaintiff endeavored on the trial to try
the question of title to the office of trustees.   Upon the mo-
tion to set aside the nonsuit and for a new trial, Mr. Justice
Van Ness says:   "The trustees of the Parish of Newburgh
are a body corporate, and it is taken for granted, on all hands,
that the title to the lands in controversy is vested in that cor-
poration or those claiming under it; and in my view of the
subject the only question presented by the case is, who are
the members composing the corporation.   To determine that
question, the counsel on both sides have proceeded on the idea
that a decision as to the validity of one, or both, the elections
of trustees is necessarily involved.   I think differently.   The
question, in this action is not who are the trustees *de jure,* but
who are the trustees *de facto.*   As long as the conflicting
claims of these different sets of trustees, both elected under
color of right, to the exercise of the corporate rights remains
undetermined, so long the possessions held under either ought
not to be disturbed.   I am satisfied that in the present suit
these claims cannot be tried.   The only way in which the
legality and regularity of these elections can be settled is by
information in the nature of *quo warranto,* under our statute.
This is the appropriate remedy in all cases of contested cor-
poration elections, and either of the parties may resort to it

to have their rights fully investigated and finally determined." This case, it will be observed, is similar in most respects to that under consideration; and upon its authority, as well as upon principle, I think that as soon as it appeared upon the trial that the defendants were in possession of the premises in dispute, holding them for the religious corporation of Bellport, under color of an election apparently regular, held in conformity with the statute, the plaintiffs should have been nonsuited.

For these reasons I think the judgment should be affirmed.

[DUTCHESS GENERAL TERM, May 9, 1859. *Lott, Emott* and *Brown,* Justices.]